# EXHIBIT A

MARY J. WOODHEAD, ATTORNEY (5581)
299 SOUTH MAIN STREET, SUITE 1300
SALT LAKE CITY, UTAH 84111
TELEPHONE (801) 532-6367
mjwoodhead@att.net

**If you do not respond to this document within applicable time limits, judgment could be entered against you as requested**.

ATTORNEY FOR PLAINTIFFS

---

## IN THE THIRD JUDICIAL DISTRICT COURT, STATE OF UTAH
## SALT LAKE COUNTY

| | |
|---|---|
| MICHAEL BRYANT, ELIZABETH PITTS, HILLARY MCDANIEL, REBEKAH BIRKETT AND BRIM WACHENDORF | COMPLAINT |
| | Case Number |
| PLAINTIFFS, | Tier 3 |
| v. | Jury Trial Demanded |
| THE UTAH PRIDE CENTER, | |
| DEFENDANT. | |

Plaintiffs, Michael Bryant, Elizabeth Pitts, Hillary McDaniel, Brim Wachendorf[1] and Rebekah Birkett (collectively Plaintiffs), by their counsel, Mary J. Woodhead (she/her), brings this action against the Utah Pride Center for damages and to seek redress for breach of contract, discrimination, retaliation and wrongful termination arising out of their complaints of bias and financial mismanagement at the Pride Center.

### INTRODUCTION

Plaintiffs were each employed at the Utah Pride Center in various capacities until the spring of 2020, when they were all terminated, allegedly because of funding challenges created by the coronavirus pandemic. During their employment, each of the Plaintiffs received positive

---

[1] At the time they worked at the Pride Center, Brim Wachendorf was known as Brim Custen. They have since legally changed their last name to Wachendorf.

feedback regarding their work and were performing well by all objective measures. Where Plaintiffs were charged with contributing to the financial success of the Center, they were successful in doing so. Plaintiffs also, collectively and individually raised multiple concerns about the management of the Center, from its accounting practices and financial reporting to discrimination and harassment based on gender and gender identity. Plaintiffs were and are committed to the success of the Pride Center.   Despite repeated efforts to discuss and report these matters with the Pride Center Board, Plaintiffs were rebuffed. And despite applying for and receiving Paycheck Protection Act funds, the Center made a decision to bank those dollars and fire staff instead. Plaintiffs were all subject to prohibited retaliation and fired not long after they complained in writing about the Center's failure to abide by its legal obligations.

## PARTIES

1. The Utah Pride Center ("Pride Center") is a non-profit entity located in Salt Lake City, Salt Lake County, Utah.

2. The Pride Center is governed by a Board of Directors.

3. Elizabeth Pitts (she/they) was an employee of the Utah Pride Center from October 2016 to May 1, 2020 and previously served on its Board of Directors. She is a resident of Salt Lake County.

4. Michael Bryant (they/them) was an employee of the Utah Pride Center from November 2019 to June 10, 2020 and is a resident of Salt Lake County.

5. Hillary McDaniel (she/they) was an employee of the Utah Pride Center from November 13, 2018 to June 10, 2020 and is a resident of Salt Lake County.

2

6. Brim Wachendorf (they/them) was an employee of the Utah Pride Center from April 2018, which with a four month break in 2019 until May 1, 2020 and is a resident of Salt Lake County.

7. Rebekah Birkett (any and all pronouns) was an employee of the Utah Pride Center from October 2018 to June 10, 2020 and is a resident of Salt Lake County.

8. Rob Moolman (he/him) is the Executive Director of the Pride Center and was in that position during all events relevant to this Complaint. Moolman was promoted to CEO after Plaintiffs were terminated and continues to retain the titles of both Executive Director and CEO.

9. Stratus HR is a human resources consulting firm hired by the Pride Center to manage matters related to employment at the Center.

10. Natalie Soltero is an employee of Stratus HR assigned to work on Pride Center matters.

JURISDICTION AND VENUE

11. This court has jurisdiction of this action pursuant to Utah Code Ann § 78A-5-102(2) because this matter is civil in nature and not otherwise exempted.

12. Venue is appropriate pursuant to Utah Code Ann § 78B-3-307 and § 78B-3-304 because the parties reside in Salt Lake County, the facts underlying each cause of action occurred in Salt Lake County and the contract was to be performed in Salt Lake County.

FACTS

13. Plaintiffs reallege Paragraphs 1 through 12 as if they were set forth herein.

14. Prior to February 2020, plaintiffs were all employed by the Pride Center and

3

receiving positive feedback regarding the quality of their work.

15.  Beginning in February 2019, Moolman engaged in hiring decisions that were made without job postings, or any transparent interview or hiring process. No people of color or transgender persons were given an opportunity to apply and the romantic partner of the Center's cis-gender Operations Director was hired for an important position with no input from existing staff.

16.  The Operations Director's romantic partner was one of several hires causing concern among center staff.

17. About this same time, several plaintiffs became aware that the Operations Director had likely engaged in questionable accounting practices and misuse of Center property.

18. Birkett was the employee who first witnessed the wrongdoing and reported it to Moolman.

19. Birkett believed these practices to violate the law and the Center's legal obligations to its grantors and other funding sources.

20. The Operations Director was eventually asked to resign by the Board.

21. On March 1, 2019, McDaniel emailed Moolman raising concerns about the Center's hiring processes specifically raising the fact that the process excluded people of color and those who were transgender.   She described the Center's employment policies as unethical and possibly illegal.

22. The Center had no policies in place and often hired for different positions by unpredictable and irregular processes at Moolman's discretion.

23. Employees were required to sign written agreements promising not to engage in

4

conflicts of interest and committing to report suspected violations of law or policy.

24. The required document provided that the "Utah Pride Center prohibits any form of retaliation, harassment, intimidation, or adverse employment action against an employee who reports or cooperates in the investigation of any suspected violation of law [or] policy."

25. On information and belief, each of the Plaintiffs executed this document.

26. On March 11, 2019, Pitts also emailed Moolman alleging discrimination in the Center's hiring practices and inequity in hiring, compensation and promotion.

27. Moolman responded to both Pitts and McDaniel and thanked them for raising concerns, indicating that the Board was working to improve the Center's employment practices but stating he had the prerogative as Executive Director to fill certain positions at his discretion.

28. Pitts had a good faith belief the Center was acting in violation of Federal law.

29. Moolman immediately began treating Pitts with mistrust.

30. In November 2019, Pitts met with Moolman to request a pay raise.

31. Moolman told her that despite doing work worthy of such a raise, she would not receive one because of her March 2019 complaint and because she was not a team player.

32. Pitts did not receive a merit raise.

33. In 2019, the Pride Center hired Stratus hr. to manage its human resources program. Natalie Soltero was the main stratus employee hired to work on Pride Center issues.

34. Birkett is non-binary and began alerting Moolman in July 2019 of issues with the Center's human resources programming regarding pronouns and other problems

5

with identifying information in the systems provided by Stratus.

35. Moolman said he would work on resolving the problem.

36. Stratus declined to correct the issue and indicated that it was required to only use the gender assigned at birth in its systems for legal reasons.

37. This was untrue.

38. Also in 2019, Birkett complained to Moolman about feeling unsafe due to the presence of registered sex offenders on the Pride Center premises.

39. Moolman indicated that the Center was unable to create a policy or take action on this issue due to the diverse population served by the Center.

40.  In December 2019,   Pitts met with Soltero and Moolman to further discuss her concerns about discrimination at the Center and to ask again for a pay raise.

41. She told Soltero about Moolman's comment about his reasons for not giving her a raise and Soltero responded that such a motive would be considered retaliation.

42. In December 2019, every manager at the Pride Center received a merit raise except Pitts.

43. At that time, the Center had no performance appraisal process or system in place and no such appraisals had occurred.

44. Also in December 2019, McDaniel sent an anonymous email to Soltero at Stratus raising concerns about the erratic, unethical and discriminatory practices at the Pride Center. The complaint cited the conflict of interest policies she had been required to sign and noted the multiple violations of those policies by Moolman. She indicated that she wanted to remain anonymous out of fear of retaliation.

45. Soltero responded that she could not proceed on an anonymous complaint.

6

46. McDaniel was afraid of retaliation so she did not agree to set aside her anonymity.

47. Soltero did not pursue the complaint or make any effort to investigate the issues raised by McDaniel.

48. On April 15, 2020, Pitts complained in writing to Soltero about Moolman's continued retaliation and hostility.

49. Also in late April 2020, Bryant became concerned that they were receiving conflicting direction from Pitts, who was their supervisor and Moolman, who seemed to be inserting himself into Pitts' areas of responsibility.

50. Bryant asked Moolman if Pitts could be included in an upcoming meeting so that they might all be on the same page.

51. Moolman did not respond to Bryant's repeated requests.

52. Bryant then reached out to Chris Jensen, the Vice Chair of the Pride Center Board to raise concerns about Moolman's behavior and ask for help.

53. Bryant noted that Moolman was dismissive of Pitts and seemed to be trying to prevent Pitts from performing her job.

54. Bryant also noted that Moolman was moody and rude to employees attempting to fulfill their duties.

55. Jensen did not respond to Bryant's email.

56. During this time period, employees were communicating among themselves about

the damage they believed Moolman was doing to the Center by his erratic and
discriminatory behavior. They were also concerned about the Center's compliance
with financial reporting rules imposed by the government on grant recipients and
non-profits.

57. Moolman was also hiring cis-gender white males to do contract work while
reducing the hours of transgender and non-binary employees.

58. Wachendorf collaborated with Moolman in August 2019 to create a job
description. They agreed that Wachendorf's primary duties would be creating and
managing social media content, being a media liaison, writing press releases,
working with any outside marketers and managing marketing for the Pride festival.

59. Despite Wachendorf's experience and expertise with social media, Moolman often
ignored their advice and information they provided about how social media
algorithms worked.

60. In February 2020, without notifying, Wachendorf, Moolman retained a white
cis-gender gay man to do media relations, which were duties included in
Wachendorf's job description.

61. Shortly thereafter, Wachendorf had a meeting with Moolman about his
unwillingness to increase their hours from 30 to 40 hours a week commensurate
with their workload. Moolman refused.

62. Frustrated, Wachendorf reached out to Stratus to initiate a formal complaint about
Moolman's willingness to assign their work to male employees and to disregard
their input.

63. Stratus reached out to Wachendorf and Moolman on a group email to arrange a

8

meeting.

64. Moolman replied that he needed information about how to fire employees ASAP. Wachendorf was copied on this email.

65. On April 24, Wachendorf met with Status and Moolman to discuss their complaint.

66. Moolman stated that Wachendorf's job was limited to social media regardless of the written job description. The parties agreed to meet again in a week.

67. On April 30, 2020, Pitts and Wachendorf were terminated, allegedly due to a financial shortfall caused by the coronavirus.

68.  Shortly after Pitts' termination, the Center posted an opening for the position of Associate Executive Director, a job which was eventually filled by a cis-gendered white male who was paid more than Pitts. The job was ninety percent based upon the work that Pitts was doing.

69. Also in May 2020, Birkett's hours were reduced from 40 hours a week to 30 hours a week.

70. On May 1, 2020, Bryant and Moolman had an email exchange about Bryant's job description where Moolman indicated that he was still trying to determine who would be doing what work.

71. On May 5, 2020, Moolman told Bryant that they would be a vital part of his team.

72. As the date of the Pride Gala approached, employees continued to express concern that Moolman was not responding to communications and was not available to be part of the process.

73. On May 27, 2020, Pitts wrote an email to the Board and staff department heads raising concerns about the Center's hiring processes and financial irregularities in

the Center's budgeting and accounting practices.

74. Attached to her email was a series of notes discussing concerns about the Center with entries by Pitts, McDaniel, Bryant, and Birkett as well as Amanda Darrow and Joshua Bravo, connecting each of them to Pitts' concerns. Darrow and Bravo both worked in the social services arm of the Pride Center and their notes reflected their concerns about the future of their programs.

75. As part of her email, Pitts asked to meet with the Board to discuss these concerns.

76. In response to Pitts' email, McDaniel replied all in support of Pitts' concerns. Among others, this email went to the Board of Directors.

77. At no time during the course of the matters raised in this Complaint did the Board meet with Pitts or any other terminated or concerned employee, despite numerous requests.

78. Later that day, Moolman sent an email to the Pride Center staff about the importance of rallying forward as a team.

79. On June 1, in response to concerns about the Center's audit history and accounting practices, Bryant sent an email to Mona Stevens, Chair of the Pride Center Board of Directors, Chris Jensen and Marci Milligan suggesting the services of an accountant who had helped clean up the finances of another organization they had been involved with.

80. Bryant received dismissive responses from Jensen and Stevens indicating that Bryant was misinformed and that the Center was up to date on its auditing responsibilities and that the Board was compliant in its financial oversight.

81. Bryant responded that it was Moolman who indicated the Center was behind in its auditing obligations and that Moolman had stated that accountants had found the Center's books to be un-auditable. Bryant also apologized for any misunderstanding.

82. After Pitts was terminated, Birkett and other Pride Center employees, including Bryant, Birkett and McDaniel were assigned extra work to facilitate the Center's "Pride Spectacular" fundraising event.

83. Moolman articulated that these employees were taking over parts of Pitts' job.

84. By all accounts, the event was a financial success in that it raised more money than expected.

85. In the course of planning for the event, Birkett was required to interact with a contractor named Erick Hutchins.

86. Without their permission, the Pride Center gave Hutchins Birkett's personal phone number. Hutchins made an unsolicited call where he suggested that Birkett and other members of the Pride Center staff strip to help raise money for the Center.

87. Birkett felt uncomfortable and harassed by the interaction. They complained to Moolman, Soltero and Mona Stevens, the Chair of the Pride Center Board, about the call and the release of their private cell phone number.

88. Stevens told Birkett that the interaction was a miscommunication and to continue working with Hutchins.

89. Hutchins continued to have free reign at the Pride Center and continued working as a contractor on the Pride Spectacular event.

11

90. Birkett then emailed Soltero to inquire about their ability to file a complaint based on the interaction with Hutchins.

91. On June 8, 2020, Birkett emailed the Pride Center Board raising concerns about financial mismanagement under Moolman's direction by both Moolman and the former operations director referenced above and the failure of the Pride Center to abide by standard accounting practices. They also had evidence that funds and property had been diverted to non-business uses.

92. Birkett also indicated that Center staff was not providing sufficient information to balance and account for credit card expenses.

93. Birkett expressed concern that the Center was non-compliant with its legal obligations as a non-profit and its contractual duties to funding sources.

94. Birkett again raised the problem of Stratus and the Pride Center misgendering employees.

95. On June 2, 2020, Bryant also had an interaction with Hutchins where Bryant was repeatedly misgendered by Hutchins, who was also somewhat aggressive in his personal interactions.

96. This was not the first time Bryant had been misgendered at the Pride Center.

97. Bryant had previously been misgendered by John Johnson, a cisgender male who remains employed at the Center after being promoted to Director of Operations and Administration.

98. When Bryant discussed the Hutchins incident with Moolman, they were told by Moolman that he could not guarantee Bryant would not be misgendered in the future.

99. Bryant then made a formal complaint to Soltero about the misgendering and Moolman's unwillingness to take steps to protect Bryant.

100.　　　Soltero told Bryant that misgendering was not "objectively improper conduct" or harassment but that she would speak to Hutchins.

101.　　　Hutchins continued and continues to work with the Pride Center despite these complaints.

102.　　　Following the event, Bryant was told that they were a "rock star" and that their work was exemplary.

103.　　　Also on June 8th, McDaniel emailed the Board asking to be added to their agenda to discuss ongoing violations of the conflict of interest policy.   She repeated this request on the morning of June 10 and specifically raised this issue of Stratus investigating its own misconduct as an additional conflict.

104.　　　On June 10, Bryant, Birkett and McDaniel were terminated by the Pride Center, allegedly due to lack of funds.

105.　　　On information and belief, the Pride Center continues to engage to use grant monies beyond the parameters for which they were obtained.

106.　　　The Pride Center is divided into Teams. Every employee who worked on the Programs or Operations Teams who complained to Moolman or the Board about discrimination, harassment or financial wrong doing was terminated allegedly as a result of the pandemic.

13

107.    The terminations were in violation of the Center's written promise against retaliation for reporting violations of law and policy.

108.    On May 1, 2020, the Pride Center received $166,100 in Paycheck Protection Funds intended to protect the jobs of 25 employees.

109.    On February 5, 2021, the Pride Center received $153,835 in Paycheck Protection Funds intended to protect the jobs of 14 employees.

110.    Shortly after receipt of the 2021 PPP funds, substantial raises were granted to Moolman, Johnson and Jonathan Faulk, a white cis-gendered male who holds the title of Chief Operation Officer and does the same work previously performed by Pitts.

TERMINATION IN VIOLATION OF
PUBLIC POLICY

111.    Plaintiffs reallege the facts set forth in paragraphs 1 through 110 as if fully set forth herein.

112.    Plaintiffs made efforts to make the Pride Center Board aware of financial mismanagement at the Pride Center.

113.    Plaintiffs had a good faith belief that the Center was non-compliant with its obligations as a non-profit corporation registered with the State of Utah to correctly file financial reports.

114.    Plaintiffs also believed the Center was in breach of the terms of grants it had received from government entities and private funding sources.

115.    Plaintiffs made multiple efforts to share these concerns with the Pride Center Board.

116.     Plaintiffs believed the Pride Center was acting in violation of Federal and

State law requiring non-profits to honestly and completely document and report

their financial status and to use government and private funds for the purposes for

which they were granted.

117.     Plaintiffs' concerns about the Center's compliance with its legal obligations

as a non-profit and recipient of government grants implicated a clear and

substantial public policy set forth in State and Federal Law.

118.     Plaintiffs were subject to an adverse employment action, termination, after

their efforts to alert the Pride Center Board regarding these violations of clear and

substantial public policy.

119.     Plaintiffs were wrongly terminated in violation of the public policy as set

forth in Utah and federal law.

120.     Plaintiffs suffered lost wages and the loss of the ability to continue

performing important work which they valued, as a result of their wrongful

termination.

121.     Plaintiffs are entitled to actual damages including but not limited to lost

wages, punitive damages and attorney's fees as a result of the Center's knowing

and intentional breach in violation of public policy.

TITLE VII
RETALIATION
(Pitts, Birkett and Bryant)

122.     Plaintiffs reallege the facts set forth in paragraphs 1 through 121 as if fully

set forth herein.

15

123.     Plaintiffs Pitts, Bryant and Birkett have all fulfilled all statutory requirements to bring this claim.

124.     Pitts, Bryant and Birkett each raised issues of discrimination with Moolman, Stratus and the Pride Center board.

125.     The complaints arose out of consistent misgendering and the failure of Moolman to open jobs to anyone other than cis-gender persons who he hired without any kind of process.

126.     In each case, Moolman and the Board defended the Center's actions by indicating that Moolman had the discretion to hire whomever he chose and that the Center was not bound by any process.

127.     Pitts, Bryant and Birkett efforts to speak to the Board about this discrimination were consistently rejected.

128.     Pitts was told she had been denied a raise because she was not a team player.

129.     Wachendorf's efforts to arrange a grievance meeting were met with a request to Stratus for advice on terminating workers.

130.     Not long after raising these concerns, Pitts on April 30 and Birkett and Bryant on June 10, were terminated from their positions with the Pride Center, allegedly for lack of funds.

131.     In each case, Plaintiffs complaints were based on a good faith belief that the Center was acting in violation of Title VII.

132.     By the time Birkett and Bryant were terminated, the Center had received Paycheck Protection Act funds intended to protect employees from termination.

16

Nonetheless, the Center announced that it would terminate the workers and bank the ppp funds.

133.     Pitts, Bryant and Birkett were terminated in retaliation because they raised concerns that the Center was engaging in conduct in violation of Title VII.

134.     These retaliatory terminations violated Title VII.

135.     As a result of the Center's prohibited retaliation, Pitts, Bryant and Birkett suffered damages, including but not limited to lost wages,

TITLE VII
DISCRIMINATION
(PITTS, BRYANT AND BIRKETT)

136.     Plaintiffs reallege the facts set forth in paragraphs 1 through 132 as if fully set forth herein.

137.     Plaintiffs Pitts, Bryant and Birkett have all fulfilled all statutory requirements to bring this claim.

138.     As Executive Director of the Pride Center, Moolman showed favoritism toward cis-gendered males, which disadvantaged Plaintiffs.

139.     He was more comfortable in their company, more likely to promote and pay them more and defensive of their conduct in the face of accusations of discrimination.

140.     Bryant and Birkett both were both misgendered in the workplace and in both cases, Moolman dismissed their complaints as trivial.

141.     Pitts was paid less than a cis-gendered male doing the same work.

17

142.     Through Stratus, the Center maintained human resources record keeping which failed to allow workers to enter information about their gender identity if they were not cis-gendered. Center staff repeatedly had difficulty entering their own data because of these failures of Stratus.

143.     Moolman never made an effort to demand that Stratus correct these failures nor did he ever make any public statement to the Pride Center staff that they should respectfully address workers by their accurate pronouns.

144.     Moolman dismissed the input of employees who were not white, male and cis-gendered leaving Plaintiffs at a disadvantage in the workplace.

145.     Plaintiffs were all paid lower wages than male cis-gendered employees doing similar work, because of their disfavored gender.

146.     As a result of the Pride Center's discrimination, Plaintiffs suffered hostile and discriminatory working conditions and lost wages.

147.     Because they loved working at the Pride Center, they were forced to endure discriminatory working conditions where they felt rejected based upon their immutable identity.

148.     The Pride Center should be ordered to correct these inequities including an award of lost wages, damages for the emotional distress suffered as a result of the Pride Center's failure to maintain a non-hostile workplace and attorneys fees.

**BREACH OF CONTRACT**

149.     Plaintiffs reallege the facts set forth in paragraphs 1 through 148 as if fully set forth herein.

18

150.     As employees of the Pride Center, Plaintiffs were required to sign documents pledging not to engage in conduct constituting a conflict of interest.

151.     Moreover, they agreed to report any violation of law or policy to the Executive Director or the President or the Pride Center's Board of Directors as well as the Center's legal counsel.

152.     The employees were required to sign a stand-alone agreement whereby the Center pledged not to retaliate against any employee for raising concerns about violations of law or policy.

153.     On information and belief, all Plaintiffs signed this document.

154.     The Center breached this written, signed agreement when it terminated Plaintiffs for raising and attempting to raise concerns with Moolman and the Board about discrimination, retaliation, conflicts of interest, and financial wrongdoing contrary to the promise in the agreement that they would be shielded from retaliation.

155.     As a result of the Pride Center's breach of this agreement, Plaintiffs suffered damages including lost wages.

### JURY DEMAND

**PLAINTIFFS REQUEST A JURY TRIAL ON ALL CAUSES OF ACTION WHERE PERMITTED BY LAW**

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

- A judgment that the Pride Center retaliated against Plaintiffs Pitts, Birkett and Bryant for protected opposition based on their reasonable and good

faith belief that the Pride Center was acting in violation of Title VII.

- A judgment that Plaintiffs were damaged as a result of the Pride Center's breach of contract.

- A judgment that Plaintiffs were wrongfully terminated in violation of public policy.

- An award in an amount to be proven at trial of back pay, front pay, punitive damages, lost benefits, and other consequential damages for lost compensation and job benefits suffered by Plaintiffs on an ongoing basis.

- The requested monetary remedy in this matter including lost wages, emotional distress, and punitive damages in an amount to be proven is likely to be in excess of $300,000, the amount necessary to designate this matter as Tier 3.

- An award of litigation costs and expenses, including reasonable attorneys' fees.

- Any other appropriate equitable relief to which Plaintiffs are entitled.

DATED this 30th Day of June, 2021.

/s/Mary J. Woodhead
MARY J. WOODHEAD
ATTORNEY FOR PLAINTIFFS

20